156 So.2d 683 (1963)
Bessie BROWN, Appellant,
v.
Doris Brown HUTCH, Appellee.
No. 3671.
District Court of Appeal of Florida. Second District.
September 25, 1963.
Rehearing Denied October 21, 1963.
*684 P.B. Howell, Jr., Leesburg, for appellant.
Arthur E. Roberts, Groveland, for appellee.
KANNER, Acting Chief Judge.
A final decree confirming and ratifying a deed of conveyance to certain property is the target of this appeal. The deed was from one W.J. Brown, now deceased, to one of his daughters, defendant-appellee, Doris Brown Hutch, and the suit was brought by another daughter, Bessie Brown, plaintiff-appellant, who attempted to have the deed set aside. Grounds asserted were that the property was the homestead of Brown, a widower, and that there had not been an effective delivery of the deed.
Briefly, the record reveals that Brown in 1947 purchased approximately 20 acres of rural land in Lake County and in 1948 constructed a small concrete block home on about 6 acres of it. Although Brown was the father of eleven living children, including appellant and appellee, he was at the time alone, a widower whose offspring had dispersed and gone their separate ways. In 1949, appellee daughter, with her infant son, moved into the home with the father. Thereafter, in 1952 or 1953, she was married to James Hutch. Since then, except for brief departures, the two have continued to reside there, as has appellee's son. In May of 1960, the father left for Frostproof, where he spent the remainder of his life with another daughter. He died there in June, 1961, at the age of 90.
The deed to the house and the 6 acres upon which it stands was prepared at the father's behest on or about March 1, 1951, and was delivered by Brown to a friend and adviser, together with a letter under that date instructing the friend to deliver the deed to appellee upon Brown's death:
"I am handing you herewith deed of my home place to my daughter, Doris Hopman. You are to hold this deed & deliver it to my daughter upon my death. It is understood however, that no party (sic) is to invest in her during my lifetime and I am to have the use and enjoyment of the property so long as I live."
In December of 1958, Brown had a new deed prepared by an attorney and transmitted it to the same person who had held the original one. Asking for the old deed, Brown handed the depositary the following letter:
"Since making the above mentioned deed, my daughter is divorced and remarried and is now married to James Hutch, so in order to have her name correctly written in the deed, I have rewritten the above deed and enclose the same for delivery to Mrs. Doris Hutch upon my death as above stated."
Pursuant to Brown's instructions, the holder of the deed, upon the grantor's death, delivered it to appellee, who had it recorded in the public records of Lake County.
The chancellor found "That the property involved in this cause was not homestead property on the date of W.J. BROWN'S death;" and "That there was an effective delivery from W.J. BROWN to DORIS HUTCH of the deed to the property which is the subject of this suit." Both aspects of the final decree are asserted on the appeal to be erroneous.
Generally, a family, for homestead purposes, includes at least two persons *685 living together as one family under direction of one of them, who is recognized as the "head of the family." Hussa v. Hussa, Fla. 1953, 65 So.2d 759; 16 Fla.Jur., Homesteads, section 28, page 291. For determination of the existence of a family relationship, there are, in Florida, two basic recognized tests to be met, either singly or in combination: (1) a legal duty to maintain arising out of the family relationship; (2) a continuing communal living by at least two individuals under such circumstances that one is regarded as the person in charge. Crosby and Miller, Our Legal Chameleon, 2 Fla.L.Rev. 24; Beck v. Wylie, Fla. 1952, 60 So.2d 190; 16 Fla.Jur., Homestead, section 27, page 290.
The force of appellant's argument is directed to the proposition that there was communal living among the occupants of the house, with W.J. Brown being the person in authority, the one who was looked to as the head of the family, and the one who paid the normal household bills and expenses. The testimony as to this, however, is diametrically conflicting.
The witnesses who testified for the respective parties consisted of members of the family of the litigants, except for the depositary of the deed who was a lifelong friend of Brown, his business adviser, and executor of his estate. In substance, that portion of the testimony upon the subject of family relationship within the home which was given by appellant and one of her brothers on her behalf was that the father paid the bulk of the ordinary household expenses, together with costs for repairs and additions to the house, that he owned the furniture used in it, that he was recognized as the one in authority, that he was comparatively well-to-do, having left a cash estate of $35,000, that he had been seen upon occasions to write checks for living expense items. Appellant also presented testimony purporting to show that appellee was derelict in taking care of her father and in attending to housekeeping duties.
Appellee, on the other hand, along with a sister, a brother, and a sister-in-law, through the sum of their testimony depicted a situation in which appellee, while respecting her father's wishes, looked to her husband as head of their family. There was testimony that the father would give to appellee occasional small sums of money; that Hutch was the main support, that he and appellee paid the usual bills and household expenses, that both appellee and her husband were gainfully employed, since the wife worked during the fruit seasons, drawing unemployment compensation during off seasons, while Hutch had year-round work in citrus and melons; that they paid part of the expense of repairs to the house and addition of a bathroom; that Hutch installed a pump to supply water indoors; that appellee planted flowers outdoors; that the two painted the house; and that the household furnishings were largely appellee's. All testified that appellee attended to her father's physical care and needs. The sister-in-law stated that Brown confided to her in about 1952 or 1953 that he "had made a deed out to Doris giving her the place * * * that she was taking care of him and that she ought to have the place;" and in the spring of 1960, she related, he again told her that he had taken care of Doris for the trouble of waiting on him for the years she had lived with him.
The father's friend and business adviser testified that at times when he visited Brown, he would observe appellee doing the household chores. Brown, he said, was never dependent on anyone. He also stated that the father never ran an account, but appellee and her husband "would do some buying and charge it through our office" and that they paid the bills thus incurred as well as the cost of some of the materials for repair of the house. He had seen Hutch at the home in question and had known him for sometime, since Hutch was for several seasons in his employ.
Of the nine other surviving children of W.J. Brown, or those aside from appellee and appellant, none joined appellant in *686 prosecution of the suit protesting their sister's right to the property and seeking to invalidate the deed made by their father to her; only three, aside from the parties to the suit, testified; and two of these were witnesses for appellee, in addition to the sister-in-law. Out of the totality of the testimony emerges the fact that it was appellee who provided her father with the only regular day-to-day care and attention which he received during the more than ten years he lived in the house, since the others, living elsewhere, furnished only occasional courtesies and aid. Brown acknowledged in 1952 or 1953 and again in 1960 the services of appellee when he said in substance that the deed was to reward his daughter for taking care of him.
It is clear that when W.J. Brown built and moved into the house alone in 1948, there did not arise a homestead status. If it were assumed that the advent into the home of appellee and her infant son in 1949 resulted in a family relationship and that appellee then considered her father as head of the household, this status was dissipated after 1952 or 1953 when appellee remarried and thereafter looked to her husband as head of the family and as the one legally responsible for her maintenance. That which controls in a case of this type is, not whether a homestead status had once been in effect, but whether it existed at the time of the death of the one claimed to be the head of the family. It has not been shown that James Hutch yielded to Brown his natural and legal position as head of his family; neither has it been made to appear that Hutch shifted to Brown his responsibility of maintaining his family.
Certain Florida cases, though having litigatory objectives different from the one at bar, employ the principle by which the homestead features of property are gauged and contain some facts which may be compared interestingly to those here concerned. See Whidden v. Abbott, 1936, 124 Fla. 293, 168 So. 253; Dania Bank v. Wilson & Toomer Fertilizer Co., 1937, 127 Fla. 45, 172 So. 476; Brady v. Brady, Fla. 1951, 55 So.2d 907.
The burden was upon appellant to establish existence of a homestead through facts to sustain her allegations in this regard, since she was the one asserting it. Matthews v. Jeacle, 1911, 61 Fla. 686, 55 So. 865; Banks v. Banks, Fla. 1957, 98 So.2d 337; 16 Fla.Jur., Homesteads, section 85, page 336. The chancellor, who heard the testimony, obviously concluded, under the conflicts and inconsistencies of the evidence, that she failed to carry this burden. We agree that, at the time of W.J. Brown's death, the property in question was not homestead property.
Under her second point, appellant questions effectiveness of delivery of the deed. She urges that Brown intended at all times during his lifetime that he could revoke, retake, or recall the deed, basing this (1) upon testimony of its holder that he would have relinquished it to Brown had he demanded this and (2) upon the return of the first deed to Brown for correction of name when requested by him in 1958. Thus, says appellant, W.J. Brown did not and did not intend to release control of the deed.
Delivery of a deed to a third person with instructions that it be passed on to the grantee, with no condition attached to delivery and no reservation by the grantor of a right to recall the deed, is a sufficient delivery in law. Smith v. Owens, 1926, 91 Fla. 995, 108 So. 891; 10 Fla.Jur., Deeds, section 99, page 117. This is likewise true if the grantor delivers a deed to a third person absolutely as his deed, without reservation and without intending to retain any control over it, even though the instrument is not to be delivered to the grantee until the death of the grantor. Williams v. Williams, 1942, 149 Fla. 454, 6 So.2d 275; Delivery of deed to third person to be delivered to grantee after grantor's death, 52 A.L.R. 1222. The question of whether or not a complete and unconditional delivery was intended by a grantor *687 when he transmitted a deed to a third person for delivery to a grantee is a question of fact determinable from all the circumstances surrounding the transaction. Bruner v. Hart, 1910, 59 Fla. 171, 51 So. 593.
In the present case, the testimony of the deed's depositary as to intention of the grantor when the instrument was left with him was that there was no understanding or agreement of any nature or kind that Brown could get the deed back, that the grantor attached no conditions to the delivery of the deed. Replying to questions which were propounded, that witness also stated, "If he ever called on me for the deed and certainly I would have handed it back to him" and "He gave it to me with no restrictions and he could ask for it the same way." Appellant has selected these quoted portions of the depositary's testimony as being supportive of her position. The first quotation with respect to what the depositary would have done if asked is a conclusion and opinion of the witness; the second quotation narrates in its first clause that which the grantor did, "He gave it to me with no restrictions * * *," while the second clause expresses again the opinion and conclusion of the depositary, "* * * he could ask for it the same way." Other evidence as to intent exists within the deed of conveyance itself, the two letters transmitted by Brown to the holder of the deed instructing that the instrument be delivered to appellee upon his death, the fact of delivery by the depositary according to Brown's directions and the depositary's understanding of the grantor's wishes, together with the subsequent recording of it, and, finally, the testimony of Brown's daughter-in-law of the two widely spaced occasions upon which he had voiced an intent consistent with that originally stated in the letters. As to the exchange of deeds by Brown to show appellee's correct name under her altered marital designation, this, rather than serving to show intent to retain control, is fully compatible with the only intent ever expressed by Brown, that of vesting the property in appellee upon his death.
Testimony of a deed's depositary to the effect that he would have returned the deed upon request by its grantor has been considered in various jurisdictions through cases which concerned delivery of a deed after death of its grantor. Such statements have been repeatedly held to be opinion testimony having no legal significance. In the Montana case of Pymale v. Keene, 1926, 76 Mont. 403, 247 P. 554, the depositary testified that, had the grantor demanded return of the deeds in question, he would have complied. This testimony was deemed to have been properly disregarded by the lower court as having no bearing upon the fact situation. The Mississippi court, in Beasley v. Beasley, 1927, 177 Miss. 522, 171 So. 680, followed the same reasoning, saying, "We do not consider that the opinion of W.M. Henley, that Mrs. Alexander could have recalled the deeds after they had been placed in the bank, amounted to any proof. It was what Mrs. Alexander directed to be done that will govern, not what W.M. Henley thought she could do * *." The Tennessee court, in Couch v. Hoover, 1934, 18 Tenn. App. 523, 79 S.W.2d 807, likewise expressed futility of the opinion of the depositary that he would have returned the deed to the grantor if he had demanded it. The comment was made that this was immaterial and would not invalidate the deed, as the only thing the court was concerned with was what the depositary had a right to do with the deed. In California, the court, in Wilcox v. Hardisty, 1922, 60 Cal. App. 206, 212 P. 633, found of little value evidence of what the witness "thought and of what he would have done with the deeds," the court continuing that "* * * we are concerned here only with what he had the right to do with them." From the Loomis v. Loomis case, 1913, 178 Mich. 221, 144 N.W. 552, appears the comment of the Michigan court that the conclusion of the depositary as to probability of surrender of the deed upon request was based upon nothing said by the grantor when the instrument *688 was deposited and had no bearing upon the question of delivery.
In sum, the property at the time of the death of W.J. Brown cannot be characterized as a homestead; and the delivery of the deed conveying that property was valid.
Affirmed.
SHANNON, J., and SMITH, D.C., Associate Judge, concur.